13 CV 9080

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OKLAHOMA FIREFIGHTERS PENSION
AND RETIREMENT SYSTEM, on Behalf of
Itself and All Others Similarly Situated,

                Plaintiff,

    vs.

BARCLAYS BANK PLC, BNP PARIBAS
GROUP, BNP PARIBAS NORTH AMERICA
INC., CITIGROUP, INC., CITIBANK, N.A.,
CREDIT SUISSE GROUP AG, CREDIT
SUISSE SECURITIES (USA) LLC,
DEUTSCHE BANK AG., GOLDMAN SACHS
GROUP, INC., GOLDMAN, SACHS & CO.,
HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC NORTH AMERICA HOLDINGS INC.,
HSBC BANK USA, N.A., JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION, MORGAN
STANLEY, ROYAL BANK OF SCOTLAND
GROUP, PLC, UBS AG, and UBS
SECURITIES LLC,

                Defendants.

No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT

JURY TRIAL DEMANDED

RECEIVED
DEC 23 2013
U.S.D.C. S.D.N.Y.
CASHIERS

      Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff" or "Oklahoma

Firefighters") makes these allegations on personal knowledge as to its own actions and on

information and belief as to other matters, as follows:[1]

---

[1]     Plaintiff's information and belief is based on publicly available sources and analysis
thereof, including: publicly available press releases, news articles, and other media reports.
Except as alleged in this Complaint, neither Plaintiff nor other members of the public have
access to the underlying facts relating to Defendants' improper activities. Rather, that

## NATURE OF THE ACTION

1.      This is a class action brought to recover for injuries to Plaintiff and the members of the Class (defined herein) caused by Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

2.      The foreign currency or foreign exchange ("FX") market is the world's largest and most actively traded financial market.  On a daily basis, the FX market turns over between $4.7 trillion and $5.3 trillion.[2]

3.      Defendants are FX dealers and are responsible for the vast majority of FX trading. In 2013, Defendants accounted for over 66  of FX trades.

4.      Exchange rates are the prices of FX.  WM/Reuters Closing Spot Rates (4:00 p.m. UK fix) ("WM/Reuters Rates"), known as the London close or London fix (11:00 a.m. in New York), provide a standardized method of determining exchange rates at fixed intervals for 160 different currencies.  WM/Reuters Rates are the industry-wide, global standard for closing spot FX rates.

5.      Plaintiff alleges Defendants conspired to manipulate WM/Reuters Rates thereby causing injury to the business or property of Plaintiff and the Class.  Defendants' manipulation of WM/Reuters Rates affected the pricing of trillions of dollars' worth of financial transactions in the United States, including FX trades and other instruments such as pensions and savings

---

information lies exclusively within the possession, custody, or control of Defendants and other insiders, which prevents Plaintiff from further detailing Defendants' misconduct.  Moreover, pending government investigations of Defendants' conduct could yield information from Defendants' internal records or personnel that bears significantly on Plaintiff's claims.  Plaintiff thus believes further evidentiary support for its allegations will come to light after a reasonable opportunity for discovery.

[2]      http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html.  Unless otherwise noted, all websites were last visited on October 30, 2013.

accounts that track global indices.  Defendants' collusive and manipulative practices include "banging the close,"[3] "trading ahead,"[4] or "painting the screen."[5]  Defendants' FX traders used chat rooms or instant messaging to communicate with each other in furtherance of the conspiracy,[6] brazenly referring to themselves as members of "The Bandits' Club" and "The Cartel."

6.      Defendants' manipulation of WM/Reuters Rates is currently the subject of investigation by numerous authorities throughout the world.    In the United States, the Department of Justice ("DOJ") has publicly confirmed a criminal investigation of Defendants' activities involving FX trading.[7]  The Commodity Futures Trading Commission ("CFTC") has a separate ongoing investigation.[8]  In Europe, the United Kingdom's Financial Conduct Authority ("UK-FCA") and the Swiss Financial Market Supervisory Authority ("Swiss FINMA") and its competition commission, WEKO, are investigating.[9]   In Asia, the Hong Kong Monetary Authority ("HK-MA") and the Monetary Authority of Singapore ("SG-MA") have opened investigations.[1011]  The authorities have requested documents from the Defendants, including

---

[3]      http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_b.

[4]      *Id.*

[5]      *See, e.g.*, http://www.nasdaq.com/investing/glossary/p/painting-the-tape.

[6]      http://www.ft.com/cms/s/0/06c6705c-4267-11e3-8350-00144feabdc0.html#axzz2jOt 0KCRX.

[7]      http://www.reuters.com/article/2013/10/29/forex-probe-idUSL1N0IJ19820131029.

[8]      http://uk.reuters.com/article/2013/06/12/uk-foreignexchange-investigation-idUKBRE95 B0RI20130612.

[9]      *Id.*

[10]     http://www.reuters.com/article/2013/10/16/markets-fx-rigging-idUSL6N0I61152013 1016.

[11]     http://www.bloomberg.com/news/2013-10-24/singapore-in-talks-with-regulators-on-

instant messages between members of the "Bandits' Club" and "The Cartel" regarding their fixing of WM/Reuters Rates.  These instant messages, along with similar activity among other traders, are at the center of an international investigation, according to recent public disclosures by the banks and interviews with investigators.[12]

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26(a), and under 28 U.S.C. §§1331 and 1337.

8.      This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this District.

9.      Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).   One or more of the Defendants resided, transacted business, were found, or had agents in this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

Plaintiff

10.      Oklahoma Firefighters Pension and Retirement System was established in 1980 to provide retirement and other specified benefits to qualified firefighters and their beneficiaries. Oklahoma Firefighters, headquartered in Oklahoma City, Oklahoma, oversees net assets in

---

currency-rigging.html.

[12]      http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

excess of $1 billion on behalf of more than 21,000 beneficiaries.  Oklahoma Firefighters engaged in foreign exchange transactions during the Class Period and suffered losses as a result of Defendants' collusive conduct.  Throughout the Class Period, Oklahoma Firefighters engaged in FX trading directly with one or more Defendants, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

Defendants

11.     Barclays Bank PLC:  Defendant Barclays Bank PLC ("Barclays") is a British public limited company headquartered at 1 Churchill Place, London E14 5H, England. Defendant Barclays is licensed by the New York Department of Financial Services ("NYDFS") with a registered address at 745 Seventh Avenue, New York, New York 10019 and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101.

12.     BNP Paribas:

a.      Defendant BNP Paribas Group ("Paribas") is a French bank and financial services company headquartered in Paris, France, at 16 Boulevard des Italiens, Paris, France 75009.  Defendant Paribas is licensed by the New York Department of Financial Services ("NYDFS") with a registered address at 787 Seventh Avenue, New York, New York 10019.

b.      BNP Paribas North America Inc. is a Delaware corporation headquartered at 787 7th Avenue, New York, New York 10019.  BNP Paribas North America Inc. provides corporate, investment banking, and securities brokerage activities and is an affiliate of BNP Paribas.

13.    Citibank:

       a.    Defendant Citigroup, Inc. is a Delaware corporation headquartered at 399 Park Ave, New York, New York 10022.

       b.    Defendant Citibank, N.A. is federally-chartered national banking association headquartered at 399 Park Avenue, New York, New York 10022, and is a wholly owned subsidiary of Defendant Citigroup, Inc.

       a.    Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

14.    Credit Suisse:

       a.    Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered 11 Madison Avenue, New York, New York 10010, and is a wholly-owned subsidiary of Defendant Credit Suisse Group AG.

       b.    Defendants Credit Suisse Group AG and Credit Suisse Securities (USA) LLC are collectively referenced in this complaint as "Credit Suisse."

15.    Deutsche Bank:   Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  Defendant Deutsche Bank is licensed by NYDFS with a registered address at 60 Wall St., New York, New York 10005-2858.

16.    Goldman Sachs:

       a.    Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation headquartered at 200 West Street, New York, New York 10282, with additional offices in international financial centers.  The Goldman Sachs Group Inc. is a bank holding company and a financial holding company.

b.      Defendant Goldman, Sachs & Co. is a wholly-owned subsidiary of the United States financial services corporation Goldman Sachs Group, Inc., and is its principle operating subsidiary in the United States.  Goldman, Sachs & Co. is located at 200 West Street, New York, New York 10282.

17.   HSBC:

a.      Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England.

b.      Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and is a wholly-owned subsidiary of Defendant HSBC Holdings plc.

c.      Defendant HSBC North America Holdings Inc. is a Delaware corporation headquartered in New York, and is a wholly owned subsidiary of HSBC Holdings plc, as the holding company for HSBC Holding plc's operations in the United States.

d.      HSBC Bank USA, N.A. is a Maryland corporation headquartered at 452 Fifth Avenue, New York, New York 10018, and is a wholly owned subsidiary of Defendant HSBC North America Holdings Inc.

e.      Defendants HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as "HSBC."

18.   JPMorgan:

a.      Defendant JP Morgan Chase & Co. is a Delaware corporation headquartered at 270 Park Ave., 38th Floor, New York, New York 10017.

b.      Defendant JPMorgan Chase Bank, National Association, is a federally-chartered national banking association headquartered at 270 Park Ave., 38th Floor, New York, New York 10017, and is a wholly-owned subsidiary of Defendant JP Morgan Chase & Co.

c.      Defendants JP Morgan Chase & Co. and JPMorgan Chase Bank, National Association, are collectively referenced in this complaint as "JP Morgan."

19.      <u>Morgan Stanley</u>:   Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.

20.      <u>Royal Bank of Scotland Group PLC</u>:   Defendant the Royal Bank of Scotland Group PLC ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.   Defendant RBS is licensed by NYDFS with a registered address at 101 Park Avenue, 10th & 11th Floor, New York, New York 10178-1199.

21.      <u>UBS</u>:

a.      Defendant UBS AG is a Swiss Company based in Basel and Zurich, Switzerland.

b.      Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Blvd, Stamford, Connecticut 06901, and is a wholly-owned subsidiary of UBS AG.

c.      Defendant UBS AG and Defendant Securities LLC are referred to collectively in this Complaint as "UBS."

22.      Defendants Barclays, Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS (collectively, "Defendants") were engaged in FX trades used in the calculation of the WM/Reuters Rates at all relevant times.   Each

Defendant has publicly admitted that it is being investigated by one or more governmental authorities regarding its FX trades.

23.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this complaint.

## CO-CONSPIRATORS AND AGENTS

24.    Various other persons, firms and corporations, unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

25.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

26.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

All persons who traded foreign currency directly with a Defendant in the United States between August 1, 2005 and the present which transaction was settled on the basis of WM/Reuters Rates (the "Class Period").

Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant and any person acting on their behalf.

Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

28.   Class Identity:  The Plaintiff Class is readily identifiable and is one for which records should exist.

29.   Numerosity:  Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their co-conspirators.

30.   Typicality:  Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because plaintiff engaged in currency trades that were settled on the basis of WM/Reuters Rates in the United States during the Class Period, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

31.   Common Questions Predominate:  There are questions of law and fact common to the Class, including, but not limited to:

   a.   whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize WM/Reuters Rates bought and sold in interstate commerce in the United States;

   b.   whether Defendants and their co-conspirators engaged in manipulation of WM/Reuters Rates in interstate commerce in the United States;

c.      the identity of the participants of the alleged conspiracy or manipulative scheme;

d.      the duration of the conspiracy or manipulative scheme alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

e.      whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

f.      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the other members of the Plaintiff Class;

g.      the appropriate class-wide measure of damages; and

h.      the appropriate nature of class-wide injunctive or other equitable relief.

32.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

33.     Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

34.     Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.

Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## ALLEGATIONS

Defendants Are Competitors

35.     Defendants are horizontal competitors across a wide range of activities in the financial services markets, including FX transactions and further including FX transactions that are explicitly settled according to the WM/Reuters Rates.  Defendants compete against each other to attract customers, including those that trade FX, and ostensibly compete amongst themselves with respect to proprietary trading of currencies.

36.     The injuries alleged herein were the result of Defendants' collusion and manipulation of WM/Reuters Rates, the settlement price for FX transactions that are the subject of this Complaint.  As described herein, exchange rates are the prices of FX which are set in a worldwide competitive market that operates 24 hours a day.  WM/Reuters Rates are produced using actual trades or quotes competitively determined daily FX exchange rates that occur in the market, intending to serve as a random sampling of trades occurring specifically within the 60-second fix window that is selected. It also establishes a daily contest between the Defendants to, among other things, signal their relative ability to trade currencies on behalf of their clients at a profitable margin.

Currency Markets

37.     A spot FX trade is a transaction between two counterparties to exchange sums of currencies on a settlement date in two bank business days via the exchange of bank deposits in the respective countries.  The majority of spot trading is between commercial banks, both large

money center banks and investment banks, for the benefit of themselves and their clients. A trade occurs when a party contacts another for a bid-ask quotation on a currency in a designated size. The foreign-exchange dealing bank supplies a bid and ask quote, which is either accepted or rejected by the other party. If accepted, the spot dealer will also enter into a mirror-image trade to offset the primary trade because spot dealers do not carry overnight risk and thus run their books "flat."

38.     The FX market is the largest in the financial system. The size of the total market has been estimated to be between $4.7 trillion to $5.3 trillion per day, a figure that is compounded by the FX futures and derivatives markets.[13] FX exchange trading in the United States has grown to almost $1.3 trillion per day.[14] Spot trading represented $620 billion of FX trading, FX swaps trading represented $341 billion, outright forward transactions accounted for $228 billion, and FX options trading accounted for $71 billion.[15] The FX market has grown explosively over the last decade, experiencing barely a hiccup during the financial crisis.[16]

39.     Defendants dominate the foreign-exchange market, with a combined share of more than 60 . Deutsche Bank is No. 1, with a 15.2 share, followed by Citibank with 14.9 , Barclays with 10.2 , UBS with 10.1 , HSBC with 6.9 , JPMorgan with 6.1 , and RBS with 5.6 .[17] In the spot market, the market share of the 10 firms reporting the highest trading

---

[13]     http://business.financialpost.com/2013/06/12/traders-at-some-of-worlds-biggest-banks-said-to-manipulate-rates-in-wild-west-currency-market; http://uk.reuters.com/article/2013/10/16/uk-markets-fx-rigging-idUKBRE99F0HU20131016.

[14]     http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf, page 3.

[15]     *Id.*, at 3-4.

[16]     http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[17]     http://www.bloomberg.com/news/2013-05-08/citigroup-cuts-deutsche-bank-currencies-

volumes in the U.S. market increased to 98 in 2013 compared to 91 in 2010, with the five largest firms accounting for 80, up from 74 in 2010.[18]

40.     At all relevant times, Defendants Deutsche Bank, Citibank, Barclays, UBS, JPMorgan, Credit Suisse, RBS, HSBC, Goldman Sachs, and Paribas were among the largest currency dealers in the United States.

41.     The leaders in the foreign exchange market have built their own web-based proprietary platforms, such as Autobahn for Deutsche Bank and Velocity for Citigroup, that function as in-house exchanges, in which the bank matches buyers and sellers on their own exclusive portals.[19] Unlike in a traditional securities exchange, however, where the entire market knows who is buying selling what at a given moment and can react accordingly, what goes on inside Autobahn, Velocity, and the other exclusive platforms is known only to the banks themselves, underscoring how such a large, global and liquid market can still be so opaque[20]

42.     The Bank for International Settlements ("BIS") is a hub for sharing statistical information amongst central banks and for publishing statistics on global banking, securities, foreign exchange and derivatives markets.[21] A scholarly economic study produced by the BIS titled "Information Flows in Dark Markets: Dissecting Customer Currency Trades," read by both regulators and bankers, concluded that "order flows are highly informative about future

---

lead-as-asia-trade-jumps.html.

[18]     http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf at 6, under "Market Structure."

[19]     http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[20]     *Id.*

[21]     http://www.bis.org/about/profile.pdf.

exchange rates and provide significant economic value for the few large dealers who have access to these flows."[22]

43.     Notwithstanding its size, importance, and concentration, the FX market is one of the least regulated, with most trading taking place away from exchanges.  With relatively few firms with a large share of the market, coupled with the lack of access to key price information by investors, the FX market exhibits several factors which antitrust law and economics identify as indicators for susceptibility to index manipulation.

44.     The United States does not have any specific rules or agencies governing spot or forward foreign-exchange trading, though U.K. regulators require dealers to act with integrity and avoid conflicts.  Spot and forward FX transactions are exempt from the Dodd-Frank Act, which seeks to regulate over-the-counter derivatives in the U.S.[23]  They also fall outside the European Union's Markets in Financial Instruments Directive, or MiFID, which requires dealers to take all reasonable steps to ensure the best possible results or executions for their clients.[24] There is no regulatory body for WM/Reuters Rates.  Dealer banks must, however, use industry standards for "best execution"[25] of FX.

45.     A Bloomberg report on June 11, 2013 regarding rigging of currency rates quoted Tom Kirchmaier, a fellow in the financial-markets group at the London School of Economics:

---

[22]     http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[23]     http://business.financialpost.com/2013/06/12/traders-at-some-of-worlds-biggest-banks-said-to-manipulate-rates-in-wild-west-currency-market.

[24]     *Id.*

[25]     "Best execution" requires that a dealer "take all reasonable steps to obtain the best possible result, taking into account price, costs, speed, likelihood of execution and settlement, size, nature or any other consideration relevant to the execution of the order. *See, e.g.*, http://www.sec.gov/answers/bestex.htm.

"The price mechanism is the anchor of our entire economic system . . . .  Any rigging of the price mechanism leads to a misallocation of capital and is extremely costly to society."[26]

State Street Rules for WM/Reuters Rates Setting

46.     State Street Trust ("State Street") acts as a clearing and settlement agent for equities trading,[27] listing currency management as one of their "capabilit[ies]."[28]  WM Company is a subsidiary of State Street and is the manager for WM/Reuters.  State Street's activities with respect to WM/Reuters are not overseen by any regulatory agency.

47.     State Street disseminates WM/Reuters Rates for 21 major currencies, including U.S. dollars, the Euro, Japanese Yen, the British pound sterling, the Swiss Franc, the Canadian dollar, the Australian dollar, the New Zealand dollar, and others.  These are referred to as "trade currencies."

48.     As described by the WM Company, WM/Reuters Rates are calculated for trade currencies as follows:

> Over a one-minute fix period, bid and offer order rates from the order matching systems and actual trades executed are captured every second from 30 seconds

---

[26]     http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html

[27]     http://www.statestreetglobalmarkets.com/wps/portal/internet/ssgm/home/capabilities/equitiestrading/overview/!ut/p/c4/fc5RT4MwEAfwz-JDH91dYWHMN4iEVRM2EObWF9N  OHI0tbQDFj2-NbzPu7uGS-90If-Dguxef6iwmZXuh4QA8eimaCuOUJpjnZYQsiUu6b8rwMQ7hAfhZW-kvj3DspsndESQ4z_NCSbM4WUPwy-h-JOgG--qllaPr2qH1CztMQvv5IbU6OTEIMwJ3YupuVf9m4UAQnn8CXQlAL3yb7e6RsSKI632N2lRXPcc__-t4hewpDfJymRfbOrj0usqQLUOaIaZBuVv9Ov5TCUKxsaYF985lVGXVZk5uvgHk1hui/dl3/d3/L2dBISEvZ0FBIS9nQSEh/.

[28]     http://www.statestreetglobalmarkets.com/wps/portal/internet/ssgm/home/capabilities/currencymanagement/overview/!ut/p/c4/fcs9D4IwGATgn_ReAfkY29jUOhQKLRoW0gENUcHB-PvVuBgSuRufO-ro3Sk8x3N4jPMUrnSkLu2Nr5ELxqGUTaF5blnrbZy4DTXD1PuGDp_jz7CU1RZaG8GK1gFVvO5-3RXY0os8g25EpGyiTOmipbtaQicxk4CIbJV9HX_CQWY33wa6X_aylif-AkNzSSE!/dl3/d3/L2dBISEvZ0FBIS9nQSEh/.

before to 30 seconds after the time of the fix. Trades are identified as a bid or offer and a spread is applied to calculate the opposite bid or offer.

Using valid rates over the fix period, the median bid and offer are calculated independently, and then the mid rate is calculated from these median bid and offer rates, resulting in a mid trade rate and a mid order rate. A spread is then applied to calculate a new trade rate bid and offer and a new order rate bid and offer. Subject to a minimum number of valid trades being captured over the fix period, these new trade rates are used for the fix; if there are insufficient trade rates, the new order rates are used for the fix.[29]

49.    WM/Reuters Rates are based on actual trades or quotes that occur in the market, and is intended to serve as a random sampling of trades occurring specifically within the 60-second fix window that is selected. Furthermore, Section 2.4.2 of the WM/Reuters Spot and Forward Rates Methodology Guide explicitly states that further measures of quality control, beyond the calculation detailed *supra*, are applied in processing WM/Reuters Rates.

WM/Reuters Rates' Use as a Pricing Mechanism

50.    WM/Reuters Rates serve as a settlement price for trading for 158 currencies.[30] Introduced in 1994, WM/Reuters Rates provide standardized benchmarks allowing fund managers to value holdings and assess performance measured against benchmarks without having any differences caused by exchange rates. These rates were rapidly adopted by index compilers, the *Financial Times* and other users and became the *de facto* standard for closing spot rates on a global basis. The rates also are used in forwards and other contracts that require an exchange rate at settlement. The widespread use and acceptance of WM/Reuters Rates as a pricing mechanism, and as the primary benchmark for currency trading globally, causes WM/Reuters Rates to occupy a crucial role in the operation of financial markets. WM/Reuters

---

[29]    http://www.wmcompany.com/pdfs/026808.pdf, Section 2.4.2.

[30]    *Id.*, Section 2.6.

Rates became a primary benchmark as a result of the belief that it was the product of competitive market forces whose integrity was assured by the application and enforcement of State Street's process of calculation, and quality control measures.  The rate at the 4:00 p.m. close in London (11:00 a.m. in New York) is the most commonly cited by financial contracts and investors.[31]

51.    The majority of the main equity and bond index compilers, including Citigroup Global Markets Ltd, FTSE International Ltd, International Index Co, IPD (International Property Database), JP Morgan Securities Ltd, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley Capital International Ltd, OMX (Stockholm Stock Exchange Ltd), Standard & Poors, and Stoxx LTD use WM/Reuters Rates in their calculations,[32] and the original uses of the rates in portfolio valuations and performance measurement are still very relevant.  However, other uses of the rates have developed and are becoming increasingly important.  Many customers now use the rates as a benchmark for currencies in contracts of different kinds, including the settlement of financial derivatives, as companies and other consumers need FX rates to value currency holdings at a uniform rate.  Many banks guarantee that they will trade at the WM/Reuters Rates, and this guarantee is useful for investors if they are making changes to a portfolio benchmarked against an index that uses the WM/Reuters Rates.  Furthermore, auditors accept the WM/Reuters Rates as independently fixed.[33] The WM/Reuters Rates are used by fund managers to compute the day-to-day value of their holdings and by index

---

[31]    http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html.

[32]    http://www.wmcompany.com/wmr/Partners/IndexCompilers/index.htm.

[33]    http://www.wmcompany.com/pdfs/026808.pdf, Section 1.2.

providers, such as FTSE Group and MSCI Inc., that track stocks and bonds in multiple countries. Even small movements can affect the value of funds, including pension and savings accounts that track global indexes.[34]

52.    Investors with large needs in the FX market – largely ETFs and index funds – invest internationally and need to engage in a high number of large FX trades, especially at the end of the month. These investors deal with the FX dealers, such as Deutsche Bank, Citibank, UBS, or Barclays, based on obligations to execute trades at whatever the spot FX exchange rate is at the end of the day, as set by WM/Reuters.[35]

53.    WM/Reuters Rates are also used extensively by the Chicago Mercantile Exchange ("CME"), which provides detailed instructions for investors of any kind seeking to engage in the opaque world of FX trading:

> Each CME WMR Contract, for a valid value date for cash settlement in one Business Day, shall be liquidated by cash settlement at a price equal to the daily Final Settlement Price for that day. The daily Final Settlement Price shall be equal to the WM/Reuters Closing Spot Rate for that day for the specific currency pair in question, rounded to the nearest integral multiple of the minimum price increment as identified per the Appendix to this Chapter.
>
> For select currency pairs as indicated in asterisked footnotes in the Appendix to this Chapter, the Final Settlement Price shall be calculated using appropriate WM/Reuters Closing Spot Rates for component currency pairs, and the result shall be rounded to the nearest integral multiple of the minimum price increments (also, "minimum price fluctuations") as identified per the Appendix to this Chapter. For example, the Australian dollar / Japanese yen (AUD/JPY) Final Settlement Price shall be calculated by multiplying the Australian dollar (AUD) / U.S. dollar (USD) Final Settlement Price in units of USD per AUD by the U.S. dollar (USD) / Japanese yen (JPY) Final Settlement Price in units of JPY per USD and rounding the result to six (6) decimal places.

---

[34]    http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html.

[35]    http://blogs.reuters.com/felix-salmon/2013/06/12/annals-of-market-manipulation-fx-edition/.

All open positions for that valid value date for cash settlement will be cash settled in the minimum fluctuation currency based upon the difference between the Final Settlement Price for the valid value date for cash settlement and the original trade price as submitted for clearing, times the notional value of the transaction in the clearing unit currency. In select cases as noted in asterisked footnotes in the Appendix to Chapter 300, the resulting minimum fluctuation currency amount at final settlement shall be converted into the Unit of Trading and Clearing Currency by dividing by the Final Settlement Prices.[36]

Defendants' Anticompetitive Conduct

54.     As previously alleged, dealers enter into mirror-image, or off-setting, trades because of the need to eliminate overnight risk and to run their books "flat." At the same time, however, all major FX dealers must engage in trades at the WM/Reuters Rates because of the volume of business from ETFs, pension funds, municipal funds, and endowment funds that demand these trades. Dealers, however, face uncertainty in making trades at the WM/Reuters Rates because, as described, they are median-calculated rates and therefore, such trades are "off mark." Dealers must also comply with "best execution" requirements. Accordingly, the dealers risks losing money in offsetting trades to flatten the books due to the uncertainty in the WM/Reuters Rates. FX dealers seek to avoid such unrestrained market movements by collectively manipulating the WM/Reuters Rates.

55.     Trading ahead is the unethical practice of a dealer trading ahead of its clients based on information or orders received from the client, which thereby allows a dealer to profit or avoid losses that would otherwise accrue to the client's benefit. Trading ahead on large orders that are believed to move the market allows the Defendants to adjust their own positions in advance. As alleged herein, Defendants have been trading ahead of client orders and rigging

---

[36]     http://www.cmegroup.com/rulebook/CME/III/300/300/300.pdf.

WM/Reuters Rates by pushing through trades before and during the 60-second windows when the benchmarks are set. By concentrating orders in the moments before and during the 60-second window, traders colluded to push the rate up or down, a process known as "banging the close."

56. By making a high number of low-volume trades in the one-minute period before the WM/Reuters Rates are calculated, a dealer can artificially increase or decrease an exchange rate by hundredths of a percent, as this exerts the most pressure possible on the published rate, according to three former traders – because the benchmark is based on the median of transactions during the period, placing a number of smaller trades could have a greater impact than one big deal, according to a former dealer.[37] Trading at a volatile period like the WM/Reuters London 4:00 p.m. fix could result in a ~100 basis point deviation from the day's average rate.[38]

57. Sources from certain of the largest banks have described how "banging the close" is systematically used by dealers to rig the system and exploit clients – recurring spikes in trading around the periods during calculation of the WM/Reuters Rates, where dealers influence the benchmark.[39] For example, if a bank's client has given instructions to sell $100 million of a particular currency, which by increasing supply of the currency would decrease its value in the market, the banker would sell his position at the higher, earlier rate, timing his proprietary trade to maximally reduce the exchange rate, decreasing the selling price for his client's currency, thus "trading ahead." According to PolicyMic, the banker could then buy up his client's own

---

[37] http://www.bloomberg.com/news/2013-10-08/rbs-said-to-pass-currency-trader-chats-to-fca-amid-probe.html.

[38] https://www.russell.com/documents/institutional-investors/research/does-trading-at-the-fix-fix-fx.pdf at 6.

[39] *Id.* at 5.

currency for the lower price, go home, and do it all again tomorrow.[40] As Reuters itself has acknowledged, the final result of this manipulation is that the banks would get the best execution for their end of the deal, with the client receiving the worst possible price, devaluing the currency transaction.[41]

58.    According to Bloomberg reports, Defendants conspired to artificially set WM/Reuters Rates, communicating with each other through instant message to align strategy on a routine basis when respective client orders match up enough to allow for rate-setting, as well as to glean information about impending trades to improve their chances of getting the desired move in the benchmark[42] – a.k.a. the systemic exploitation of global markets and their own clients.[43] For example, RBS has handed over records of emails and instant messages to U.K. regulators after concluding a former currency trader's communications with counterparts at other firms may have been inappropriate, according to two people with knowledge of the matter – the messages related to the dealers' trading positions.[44] On October 31, 2013, RBS suspended two traders in its FX division, according to the *Financial Times*.[45] On November 1, 2013, Barclays reportedly suspended three traders, including Chris Ashton, the global head of voice spot trading

_____

[40]    http://www.policymic.com/articles/48217/wm-reuters-fixing-need-proof-big-banks-are-rigging-the-global-economy-here-it-is.

[41]    http://blogs.reuters.com/felix-salmon/2013/06/12/annals-of-market-manipulation-fx-edition/.

[42]    http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html.

[43]    http://www.policymic.com/articles/48217/wm-reuters-fixing-need-proof-big-banks-are-rigging-the-global-economy-here-it-is.

[44]    http://www.bloomberg.com/news/2013-10-08/rbs-said-to-pass-currency-trader-chats-to-fca-amid-probe.html.

[45]    http://www.ft.com/cms/s/0/06c6705c-4267-11e3-8350-00144feabdc0.html#axzz2jOt0 KCRX (last visited November 1, 2013).

and spot currency traders Jack Murray and Mark Clark.[46]  J.P. Morgan, Citibank, UBS, and Credit Suisse are also reported to have suspended or dismissed traders in their FX divisions amid international probes.[47]  According to *The New York Times*, several banks are considering limiting the ability of their traders to chat electronically.[48]

59.      According to the *Wall Street Journal*, Richard Usher, currently J.P. Morgan Chase & Co.'s London-based head of spot trading for Group of 10 currencies in the region covering Europe, the Middle East, and Africa, took part in the chat sessions with top traders from various financial institutions when he was an employee of RBS, these people said. The group of traders in the chat rooms was known by various monikers, including "The Bandits' Club," and "The Cartel,"[49] "The Club," and "The Dream Team" – the group's membership numbered a half-dozen or more, and changed over time.[50]  The *Wall Street Journal* stated that RBS unearthed materials that indicated that Mr. Usher participated in the electronic chat room with colleagues at other banks, following its policy of alerting regulators when it finds signs of potential misconduct by employees, and handed over those chat records involving Mr. Usher to the

---

[46]      http://www.bloomberg.com/news/2013-11-01/barclays-said-to-suspend-chief-fx-dealer-chris-ashton-amid-probe.html (last visited November 1, 2013).

[47]      http://www.ft.com/cms/s/0/06c6705c-4267-11e3-8350-00144feabdc0.html#axzz2jOt0KCRX.

[48]      http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[49]      http://online.wsj.com/news/articles/SB10001424052702304330904579135603914964762.

[50]      http://online.wsj.com/news/articles/SB10001424052702303382004579129640105188078.

Financial Conduct Authority ("FCA").[51]  People briefed on the government investigations say

that the group of traders in the chat rooms included employees from RBS and UBS.[52]

Government Investigations

60.     The DOJ has opened a criminal investigation of possible manipulation of the

$5.3 trillion-a-day FX market.[53]  In a rare interview discussing an active investigation, Eric H.

Holder Jr., the United States Attorney General, said "The manipulation we've seen so far may

just be the tip of the iceberg.   We've recognized that this is potentially an extremely

consequential investigation."[54]  The DOJ's criminal and antitrust divisions are "taking a leading

role" in the "truly global investigation".[55]  The priority that investigators are giving the case,

which focuses on trading over the last decade, reflects the significance of the market in the

world's major currencies itself.[56]  The investigators have secured the cooperation of at least one

trader.[57]

61.     The DOJ's investigation comes on the heels of investigations by governments and

market regulators into the FX market, including the CFTC, the UK-FCA, and the Swiss-

---

[51]     http://online.wsj.com/news/articles/SB10001424052702304330904579135603914964762.

[52]     http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[53]     http://www.bloomberg.com/news/2013-10-11/u-s-said-to-open-criminal-probe-of-fx-market-rigging.html (last visited November 18, 2013).

[54]     http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/.

[55]     *Id*.

[56]     *Id.*

[57]     *Id.*

FINMA.[58]  The DOJ has questioned Paribas executives as part of its investigation.[59]  The CFTC

has asked major currency-dealing banks – including Deutsche Bank and Citigroup – to trawl

through their records, including emails and chat sessions, as part of its investigation.[60]

62.     Swiss Finance Minister Eveline Widmer-Schlumpf said, "It's a fact that foreign

exchange manipulation was committed," only a week after Switzerland's competition

commission WEKO and its financial markets regulator FINMA had opened investigations into

potential manipulation of FX markets by banks.[61]  FINMA is investigating several Swiss banks

and indicted multiple banks around the world were potentially implicated.[62]  Credit Suisse's

Chairman reportedly told a local Swiss newspaper that regulators had made inquiries to Credit

Suisse.[63]

63.     Following a Swiss probe into whether banks colluded to manipulate the

$5.3 trillion-a-day FX market, European Union (EU) antitrust regulators are also examining the

possible manipulation of currency rates.[64]

---

[58]     http://www.bloomberg.com/news/2013-10-08/rbs-said-to-pass-currency-trader-chats-to-fca-amid-probe.html.

[59]     http://uk.finance.yahoo.com/news/bnp-paribas-faces-quiz-currency-235625388.html

[60]     http://online.wsj.com/news/articles/SB10001424052702304402104579149803155720032.

[61]     http://www.reuters.com/article/2013/10/09/swiss-forex-idUSL6N0HZ1UI20131009.

[62]     http://uk.reuters.com/article/2013/10/16/uk-markets-fx-rigging-idUKBRE99F0HU20131016.

[63]     *Id.*

[64]     http://www.bloomberg.com/news/2013-10-07/eu-starting-inquiries-into-currency-manipulation-almunia-says.html.

64.     The HK-MA initiated an investigation into suspected price manipulation in the FX market, joining the United States and EU investigations, and following up with individual banks.[65]

65.     The SG-MA announced that it "has been in touch with foreign regulators on the issue of alleged manipulation of WM/Reuters foreign-exchange benchmark rates."[66]   In June 2013, the SG-MA "censured 20 banks for trying to rig interest rates and currency benchmarks, ordering them to set aside as much as S$12 billion ($9.7 billion) and to boost internal controls."[67] Among the banks censured were RBS, UBS, Barclays, Deutsche Bank, Bank of America, Credit Suisse, HSBC, and JPMorgan Chase.[68]  The SG-MA said that "75   of the traders involved had resigned or been asked to leave their banks, and the remainder would be disciplined by way of transfer to another job, demotion or loss of bonus."[69]

Injury to Plaintiff

66.     As previously alleged, Defendants' manipulation of WM/Reuters Rates affected the prices of trillions of dollars' worth of currency trades and other instruments that track global indexes, as well as instruments that are not specifically WM/Reuters-denominated.

---

[65]     http://www.reuters.com/article/2013/10/16/markets-fx-rigging-idUSL6N0I61I520 131016.

[66]     http://www.bloomberg.com/news/2013-10-24/singapore-in-talks-with-regulators-on-currency-rigging.html.

[67]     *Id.*

[68]     http://www.money.cnn.com/2013/06/14/news/companies/singapore-banks-sibor/.

[69]     *Id.*

## FRAUDULENT CONCEALMENT

67.     By its very nature, the unlawful activity, as alleged herein, was self-concealing. Defendants conspired and engaged in secret and surreptitious activities in order to manipulate the WM/Reuters Rates to the benefit of Defendants and to the detriment of Plaintiff and the Class.

68.     Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of the conspiracy.

69.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

70.     None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.   Plaintiff believed that the WM/Reuters Rates were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

71.     As a result, Plaintiff was prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations.

72.     There are many reasons why these facts could not have been known.  FX trades occur in the private, OTC market, and Defendants' trades and trading strategies are not public information.   Defendants do not publish information concerning particular trading entities, including trading between dealer entities.

73.     Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff from suing them for the anticompetitive activities alleged in this

Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

74.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

75.     Beginning at a time presently unknown to Plaintiff, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

76.     The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices for WM/Reuters-based financial instruments, including Plaintiff's currency trades, or other instruments, such as pensions and savings accounts that track global indexes. Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

77.     Defendants' conspiracy, and the resulting impact on the market for WM/Reuters-based financial instruments, occurred in and affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between and among the Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly, in furtherance of the unlawful restraint of trade alleged herein.

78.     The contract, combination, or conspiracy has had the following effects, among others:

        a.      Returns given to Plaintiff and Class members for currency trades or other instruments that track the WM/Reuters Rates were fixed or stabilized at levels lower than the free market would have returned but for the manipulation; and

        b.      Plaintiff and Class members have been deprived of the benefits of free, open, and unrestricted competition in the market for currency trading.

79.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury to its business or property.

80.    Plaintiff is entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

A.    That the Court enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

B.    That the Court award Plaintiff damages in an amount according to proof against Defendants for Defendants' violation of the federal antitrust laws to be trebled in accordance with those laws;

C.    That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

D.    That the Court award such other equitable and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury of all issues so triable.

DATED:  December 23, 2013

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

DONALD A. BROGGI (DB-9661)
JOSEPH P. GUGLIELMO (JG-2447)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444
Facsimile:  212-223-6334
dbroggi@scott-scott.com
jguglielmo@scott-scott.com

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
CHRISTOPHER M. BURKE
WALTER W. NOSS
KRISTEN M. ANDERSON
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com

KOREIN TILLERY
GEORGE A. ZELCS
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601-4269
Telephone:  312-641-9760
Facsimile:  312-641-9751
gzelcs@koreintillery.com

KOREIN TILLERY, LLC
STEVEN M. BEREZNEY
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone:  314-241-4844
Facsimile:  314-241-3525
sberezney@koreintillery.com

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
JODIE M. WILLIAMS
PHILLIP E. STEPHAN
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619-687-6611
Facsimile:  619-687-6610
dmogin@moginlaw.com
jwilliams@moginlaw.com
pstephan@moginlaw.com